Good morning, Your Honors. May it please the Court, Christopher Cianci on behalf of Plaintiff and Appellant George Hornberger. This appeal requests the Court's de novo review of the District Court's dismissal of Appellant's action. The crux of Appellant's action and the reason for it is to determine what, if any, funds were deposited and remain in open and active cash management accounts, or CMAs, that are held by Respondent Merrill Lynch. Importantly, Merrill Lynch does not assert and cannot assert that the CMAs at issue are empty and closed. I'm sorry, did not assert and could not assert the cash management accounts are closed? Based on the fact that we have a closed record, this was a motion for dismiss under 12b-6. So what's contained in the record is that the CMAs were opened and that they remained open and active. Where is that in the record? In the record it states in the declaration of Mr. Hornberger that the accounts were opened. It's in the complaint, the first amended complaint, and that the accounts remained open and active. He also says in his declaration that he saw a receipt that had forged signatures and initials on it that the transaction referenced in the receipt earlier that was in the fax had been consummated. What he received from Mr. Meadows was an unsigned receipt. He says in his declaration... He got it. He got it, number one. Number two, he says he saw a signed version of it in his declaration. He did not see a signed version of it. He didn't? It was in 2014 after the litigation. Further, it was not until earlier this year that I saw a copy of the receipt with signatures on it as well as initials purporting those to be of Mr. Meadows. That's correct, and that was signed in August of 2014. So he saw the signed copy once we initiated litigation and received the signed version in... Which he thought was a forgery. That's correct. Did he make a police report that this was a $2 billion theft by virtue of forgery? He did not, but he was already part of this pending litigation. The receipt that he saw was an unsigned version that he received by fax from Meadows, and Meadows had informed him that Meadows was not going to sign it and would not receive the notes. And as far as he understood until Meadows' death, the notes were not received by Meadows. Why wouldn't his viewing of the receipt in March 2002, whether it was signed or unsigned, at least put him on notice that there was some assertion that these notes were never monetized? Well, the only notice that the receipt provides is that Meadows had requested return of the notes, and that Merrill Lynch was willing to deliver the notes if provided that this receipt, which was really release language, was signed and notarized by Meadows. I don't think that a proposed release of liability puts a litigant on notice of actual fact that would establish liability. Well, it says here, this note has never been involved in any part of any transaction which involved Merrill Lynch or any of its affiliates. Merrill Lynch takes no position on the validity of or assumes no responsibility for this note, nor does Merrill Lynch have any involvement with or responsibility for William Meadows with respect to this note or otherwise. This legend, on and on and on. I mean, they say we disavow anything with respect to these notes, which we had to send to SEC because somebody was looking at them for fraud. That doesn't put a reasonable person on notice that there's something hinky here? Well, it also says in the receipt that these accounts were opened, and it's a cash management account, and you can't open a cash management account with a deposit of some cash. Where does it say that these cash management accounts were opened? In the first paragraph of the receipt. You know, by the way, you give us a bunch of – did you prepare these excerpts? Most of them are illegible because they have blocked out places that you have to use a microscope to read. Yeah, the issue here is that these declarations were provided in a motion to compel arbitration. They weren't provided in response to a motion for summary judgment on the basis of statute of limitations. So we're dealing with a record that is incomplete. He was told Merrill Lynch conducted an inquiry as to the validity of the notes but was not able to verify the notes were valid. That doesn't put a reasonable person on notice that there's something going on here? Well, it says that Merrill Lynch is investigating notes but says nothing about whether the notes were deposited or monetized, even partially. That puts you on notice, I guess, if you ask the statute of limitations question a slightly different way. That is, at what point do you believe you had notice that you wouldn't have had in terms of your ability to discover that information earlier? If, for instance, this receipt was instead a letter as we received in November 2011 from counsel with representations of fact that Merrill Lynch was purporting to... Doesn't this put you on inquiry notice at least? Do something like, what is this? Why is this happening? I mean, you can't just sit on it. And how much money is at stake? Two billion dollars. Two billion dollars? I mean, I don't know. Even in Hollywood, that's a lot of money. It is a lot of money. I think when the receipt was received, if Parnberger had eventually seen a signed receipt sometime before 2014 and this was agreed to by Meadows, that would be a different case. Well, now, wait a second. In the declaration, it says here, I'm reading from this declaration, line 12 on page 69. It says Mr. Meadows had requested that the notes be returned. So he asked, Parnberger here is saying Meadows asked the notes be returned. That's correct. And that's what this is. I thought they'd been monetized. They weren't notes anymore. Well, he asked for their return, for the physical notes. And so when he asked for that return, Merrill Lynch then sent over this receipt, which they wouldn't return the notes unless he signed this receipt. And the receipt, again, is really a release of liability as opposed to any assertion of certain facts. That's why he wouldn't sign it. He didn't want to sign anything that said these things may be bogus. And what's important about the receipt is that it doesn't mention anything about the accounts, which as far as 2011. There can't be. What they're saying is there aren't any accounts because we've checked it out. These things aren't valid. You're getting them back and we're saying we have nothing to do with them. That to me, it's a huge blinking red light that there's no cash management account because we found out these things are crazy. Why Merrill would accept some nonsense like this in the first place is beyond me. Well, the it wasn't until, again, November 2011 when it was established that. So he sat on a two billion dollar case, did nothing until 2011. Well, you know, this thing is not passing the smell test. That's the problem with it. Well, and here's the issue. Two billion dollars sitting in cash in Merrill. I mean, here's the issue. We're not dealing with Merrill. Merrill's accounts have any of Hornberger's names on them. Merrill, the accounts were with Meadows. Right. And so wouldn't those go to Meadows' estate? Those went to Elaine Meadows' address, most likely. So what did Hornberger try to do to recover, based on the partnership agreement he had, the value of these from Elaine Meadows? Well, he again trusted Meadows' representations that these notes had not been returned, that he did not sign this receipt, and that there was money deposited in those cash management accounts. So after he gets this receipt that night, he talks with Mr. Meadows about it, right? That's correct. And so we just ignore the fact that he actually knows what's going on, and they talk about, should I do it, should I not do it, should I sign, should I not sign? Well, they're talking about whether he should sign this release language. I mean, it's similar to if you walked into Merrill Lynch on the first day, and they said, well, before we open your account, we're going to give you this release. It's quite similar, because he thinks there's $2 billion floating around that needs to be monetized or not. So it's not like walking in and saying, I'd like to open an account today. And then he talks to the business guy, his business partner, about it that night. So do we just discount that evidence, the receipt plus the conversation? No, but I think there also has to be acknowledgment of the evidence of, you know, they opened this account in April 2011. They received SKRs, safekeeping receipts, that said that those funds were deposited. And those were, again, attached to a complaint. Well, it doesn't quite say that. It says that we took these things for safekeeping. And, you know, you can base letters of credit or all kinds of crazy things on them. But I can't find anywhere in there, even the part that I could read that's not blocked out, that says we converted these yen notes into some kind of legal tender. And that's available if you want to come in and take out a billion dollars in dollars or whatever it is. I couldn't find anything that says we converted these into legal tender. Well, the SKRs, as you said, are safekeeping receipts, and it says that Merrill Lynch accepts full responsibility. Where does it say we converted these into legal tender? Well, the issue, it doesn't say. It doesn't say that. All right. Why don't we say, go ahead. Can I ask a question? Sure. Before you sit down. It's about the accounting claim. Does that claim also depend on the notion that the wrongdoing here was that, well, does it depend on the fact that the notes were supposedly monetized? Or do you just want an accounting as to what happened to the notes? Because maybe I'd like them back. The latter. Hornberger has an interest in the funds in those accounts. Those accounts were set up by a partner under a partnership agreement. The accounts, again, as I said, under the record, as far as we know, at least in 2011, were open and active. And he just wants an accounting of what is in those accounts. We've yet to see any documents from Merrill Lynch that show that. So, in other words, if all that remained were just the notes were still sitting there, I gather that's what you'd like those back or your client would like those back? Whatever proceeds are in those accounts, we want to know. Well, assume there are no proceeds, right? Because I don't – I mean, in terms of the statute of limitations, it seems to me if your claim depends on the notion that he didn't find out until 2011 that the notes hadn't been monetized, I think that's just too long of a gap. But on the other hand, if all you want to do is find out what happened to the notes, I don't see any reason why you wouldn't be entitled to bring that claim once you learned in 2011 that Merrill Lynch was kind of stonewalling. I mean, that's correct, and that's why we have a number of claims that have been asserted in the complaint, including the accounting claim. Well, who showed Hordenberger the receipt that had been signed purportedly by Meadows? That's what we received from counsel for Merrill Lynch after the station of litigation. You got that? Do you have a copy of it? I think it may be in the excerpt of record. And it may not be in the excerpt of record. It's not there. So you got a copy of that. You said, what happened to these? And they gave you a copy of the receipt and says, hey, here's what happened. Meadows finally signed it. That's what they said once the litigation was initiated. So now what more can they tell you? We want to see what the accounts, they didn't say anything about the accounts, whether the accounts are clear or not. So just tell me precisely what you want on your accounting. We want to see a history of these accounts, when these accounts were opened in April, May 2000, to date. Let me ask you another question. On page three of your reply brief, you say that California Civil Code Section 338 eliminates any statute of limitations on trying to recover money from a financial institution. Is that right? To the extent that if I'm an account holder and I have an open account with a bank, I'm entitled to find information, find out information from that bank at any time. Where does it say that in Section 338 of the Code of Civil Procedure? I don't have 338 in front of me. I do, and it doesn't. Well, but I gather, I mean, listen, the way I thought of this, and that's why I asked about the accounting claim, is that let's say that I open a savings account with a bank and I deposit $100. And, you know, I forget about it for 10 years. And I go to the bank in 10 years and I say, hey, you know what, here's my receipt. I open this account. Can you let me know what the status of the funds is? And the bank tells me, you know what, we're not going to answer any of your inquiries. Goodbye. I think at that point, even though 10 years has elapsed since I opened the account, I certainly would be able to sue within whatever reasonable time after the, you know, the getting the stonewalling to find out what happened to my money. And I gather that's kind of what your accounting claim was alleging, and it didn't seem to me there was any statute of limitations problem with that. Now, maybe, as Judge McEwen suggested, you're not going to get anything that's very helpful. But I don't know why the bank would be entitled to tell you we're simply not going to answer any questions. Let's ask them. Maybe it's because Vornberger didn't have an account with Merrill. No, the account was in Meadows' name. Meadows' name, right. And you represent? Vornberger, who is the partner. So if Vornberger shows up and says I want an account, they're going to say you don't even have an account here. Well, they said that when they showed up in 2011 with an attorney's declaration that the district court didn't consider but was in the record, they showed up and they said these accounts are open and active. And then they took us to – they left for a few minutes and then came back and said we can't answer any more questions about this. Well, they got smart, being under the bank privacy laws. Well, let's hear from the bank, or from Merrill Lynch. May it please the court. My name is Kevin Woods. I'm with the firm White and Woods and I represent the Apple Leafs. Good morning. Maybe you could answer the accounting question first since it's the narrowest. Well, I think the statute of limitations would have expired on that claim as well. I think the statute that would be applicable would be the claim that that was attached to, which would be the gravamen of the claim, which would be either the breach of fiduciary duty or – How could the accounting claim expire if there's an account today? Can't the account holder say what's the status of my account today? And may I have the records, the historical records? If the account's still open? Yes. If the account's still open, the account holder could certainly ask for an accounting. Okay. The account is not open and Mr. Hornberger, as Judge Trott pointed out, is not an account holder and doesn't have any right to any sort of an accounting. What happened to the account? The account was opened. It's not in the record, but the account was opened in April 2000 and it was closed within 30 days. The second account that's referenced on the SKRs was never actually opened. So they did open a cash management account? Correct. And if the account holder came today and said, I'd like my historical records on my cash management account, he would be entitled to those as well, correct? The account holder. If Mr. Meadows or perhaps – Elaine Meadows on behalf of the estate. Yes. Okay. But, I mean, it's off the record, but we did provide that information. They just don't like it. What's a place like Merrill doing opening a cash management account on the basis of something that on its face looks like a bogus deal? $2 billion worth of Japanese yen. Come on. And then you – I read all this stuff and you're going to stand behind this and letters of credit and all kinds of stuff. I don't understand that. Well, I did reference in our pleading, and you mentioned the word earlier, bogus. Right. And I think if you look at the details of the safekeeping receipts, they have bogus written all over them. There are two letters that say, per Mr. Meadows' request, I confirm on behalf of Merrill Lynch that the following notes were deposited in his account. But if you look at the SKRs, the safekeeping receipts, the beneficiary of the safekeeping receipts is not Mr. Meadows, it's not Mr. Hornberger. It's the Wellington International Trust. Exactly. Nor is it the partnership. If you look at the two letters that confirmed the deposit into his account, one of them references the SKR for the SKR that deposited 14 notes. But if you look closely, the SKR number on that SKR is different than the number that's on the letter referencing the SKR that deposited those notes into that SKR. The numbers are different. You'll also notice that the SKR, which is not a debt instrument, has a maturity date, which seems odd. They're in the record, and it says Merrill Lynch on it, and I can't go outside of the record to explain the background of it. But the receipt for promissory notes that was tendered to Mr. Meadows, and I don't disagree with Council's characterization as a proposal. It was a proposal. These were proposed settlement terms, effectively, that contained a release. But in those terms, Merrill Lynch wanted Mr. Meadows to agree that they could not determine that the notes were valid, and obviously if they were given $2 billion worth of notes, they would have performed significant due diligence to determine if they were valid, and they were unable to do that. Can I go back to the accounting claim? Just looking at paragraph 13 of the complaint, I think it is. I'm sorry, the First Amendment complaint? Let's see. Do you want to just see? I think it's ER-95, maybe. I don't know. So that was the original complaint? That's the original complaint. All right. I'm sorry, page. I was looking at ER-95, but maybe I'm in the wrong complaint. Okay, First Amendment complaint. The allegation I was looking at there was just that he says, I don't know if he repeats it in the First Amendment complaint, but there he says that pursuant to the terms of the partnership agreement, he had half interest in these notes and the accounts, and that upon Mr. Meadows' passing, under, I don't know, terms of whatever estate documents he had, he became the sole owner. And so, in other words, he's alleging, maybe it's not true, but he's alleging that he is, in fact, the account holder and he is coming to you as in the kind of, well, tell me why the hypothetical I posed poses a statute of limitations problem. I guess that's what I don't see. Well, so that claim would have arisen at the same time that all the other claims arose. So that statute of limitations would have been either the claim that it was basically attached to, which would be either the breach of fiduciary duty or one of the fraud claims. So it would have been. No, I'm just saying that I gave you money or property for safekeeping. There was no fixed term at which that agreement was to expire. I guess I could see if you had only agreed to hold it for a year and then I waited 10 years to come and inquire. That would be one thing. But as I read the safekeeping receipts, it just sounded like it was an open-ended, indefinite agreement to hold this property for me. OK, so I forget about it for 10 years. And I come to you at year 10 and I say, hey, I just want a status update. What's going on with my property? And at that point you say, actually, we don't have any record of these accounts, so we're not going to answer any more questions. I think I could sue at that point and be timely for an accounting claim, couldn't I? I don't see how the statute of limitations could have run on that claim. Well, so I think in that instance your basic premise is that that claim didn't begin to run until, for example, 2011 when he asked for an accounting. And what I'm suggesting is that the claim began to run back in 2002 for all of these when he received information that put him on notice that Merrill Lynch was disclaiming any responsibility for the notes or Mr. Meadows. And so that would have triggered the running on all of the claims, including an accounting claim, because if you knew in 2002 that Merrill Lynch was going to do what? Destroy the notes? Turn them over to the state as unclaimed property? I mean, the agreement that he thought he had with you, again, I'm just going on what's alleged, is that you were going to hold these notes for safekeeping indefinitely. Well, so that agreement in the alleged safekeeping receipts was formed in 2000. In 2002, he received additional information that basically brought that into question, because the SKRs and the deposit receipts and the letters basically said, you know, Merrill Lynch is keeping in safekeeping for you $2 billion worth of assets, whether they were converted to cash or just the notes. And so based on that alone, I would agree that there wouldn't be anything that would tell him he needed to seek an accounting or pursue any other claim until 2002. In 2002, Merrill Lynch unequivocally told them that, you know, there is a problem with the notes as far as you understand based on the SKRs and the deposit receipts. So that would have triggered inquiry notice for him at the very minimum to seek an accounting or to pursue any of the other claims, and he didn't do that until 2011. Okay. I think it's just because I'm not as familiar with the record as you are. I'm not following that last step. So in 2002, what – I remember that in 2002 Merrill Lynch tried to basically unload these things and say we want no part of them. But all I remember is that he said that as a condition of giving them back, Merrill Lynch insisted that Meadows sign this thing with the – whatever you call it, endorsement, and that Meadows said, no, I'm not going to sign it. And the two of them talked, and he said, no, I'm not going to sign it. So why wouldn't the plaintiff have just assumed that, okay, well, since you all imposed Meadows' signing of the thing as a condition to the return, that maybe they never were returned and that you therefore still have them. And all I want to find out is what happened to my notes. Because the receipt put Meadows – or rather Mr. Hornberger on notice of a lot more than just that. It put them on notice that the notes were transmitted to the SEC in connection with the fraud investigation. It put them on notice that Merrill Lynch wanted a legend placed on each of the notes affirming that those notes had never been involved in any kind of a transaction with Merrill Lynch at all and that they had no connection or responsibility for Mr. Meadows. And the fact that if the notes had never been involved in any transaction that involved Merrill Lynch, that's a glaring red flag that says, wait a minute, I thought these things were deposited. I have safekeeping receipts and deposit receipts that reflect $2 billion worth of transactions. I'm on notice that if I want an accounting or I want to file a claim for breach of fiduciary duty or anything else, the clock is beginning to run. I don't understand why the clock would run on an accounting. He might have foresworn an actual claim against Merrill Lynch for any kind of activity, but can he ask about his account at any time? I mean, assuming he's a proper account holder. If he's a proper account holder and the account is open, yes. Okay. I would agree with that. So there is no statute on that aspect? Well, there is a statute of limitations for an accounting claim, and it's one of two things. Either it's the substantive claim that it's attached to, fraud or breach of fiduciary duty. And we've talked about that separately. So it would be three or four. Or it would be the Section 343 catch-all, which is four years. So after four years, his accounting claim is gone. Thank you. I seem like I have about a minute left. No, actually, you're over a minute. Oh, I'm over. Oh, I wasn't looking. Let me ask you a question. Let me cut to the chase. The red means something. Have you given Hornberger an accounting? Yes. Have you told him what happened to the notes? Yes. That's what I thought. Yes. You asked about the — So this case is about nothing. Counsel asked about or suggested that they were shown the receipt in 2014. Right. The forgery. No, not — well, the alleged forgery. Got it. I'm sorry. What did you give him in 2014? It was discussed earlier in his declaration. He says that he originally saw the unsigned receipt in 2011. I'm sorry, 2002. Right. And then 2011, they got a letter from Merrill Lynch, from me, basically saying various things and that we weren't going to continue to respond to requests. And then his declaration — I didn't put this on the record. They did. It wasn't until 2014 that Mr. Hornberger or that his counsel saw a signed receipt. What's the date of the signed receipt, the forgery? It's in 2002. I'm not sure what the specific date is. And you gave him that. Yes. Well, we didn't give it to him because of the rest of these documents. We showed it to his counsel. Okay. Yes. The original. You just said a second ago, in response to Judge Trott's question, that you have given him an accounting. And all I remember is that his lawyer went to — I guess it was you personally, maybe — and you all just said, we're not answering any more questions. Go away. So what did you — that's what I'm trying to — what did you actually turn over — what did Merrill Lynch turn over to him that represents the accounting that you're — And this is — as long as I'm clear, this is off — this is not in the record. You're under arrest. Go ahead. So there was a prior law firm who filed the complaint. We spent about six months going back and forth with those lawyers, providing various documents and information showing that the accounts were open, when the one account was open, when it was closed, that the other account was not opened. There was, I believe, for the second account, there may have been a new account form that was filled out, but that's the first step in opening an account, and it never went to the second step where it goes to operations and they actually create an account number on the system. We showed them just — we showed them the receipt, obviously. There was some correspondence regarding a lot of different things. And then it was at — there was actually a lawyer before this who I dealt with who didn't file the claim. And we provided a lot of this information. He was representing Hornberger? He was representing Mr. Hornberger back in 2011, and then in 2013 the law firm that filed the complaint, they — we interacted with them for about six months, and it was my understanding that they understood the information that we had provided, and then they switched counsel and filed the First Amendment complaint. And we made additional efforts to meet with counsel to show them the same information, the same binder of exhibits that I prepared for the original attorneys. And here we are. Thank you. Thank you. I'm not sure if I have any time for rebuttal. You can have a minute for rebuttal. A minute? You kind of went in a hole about five minutes already, but that's all right. Were you shown the binder of exhibits including the signed receipt from 2002? We were shown the signed receipt. From 2002. We were shown a receipt that was purportedly signed by Meadows in 2002. Okay, that's correct. And that was shown in 2014, again, after the initiation of the litigation. Why we're here today is that 12b-6 on solely statute of limitations grounds and whether that was an error. And I think it's clear that the court was an error in granting that motion and certainly an error in not allowing us to amend to address certain issues that the court had brought up. What would your amendment say? Amendment would say why, you know, what happened over that course of time. What would the amendment say? Tell me. Amendment would say that over the course of time that the estate of Meadows, Elaine Meadows, maintained the address for the account and received information and that reasonably Hornberger had assumed that any information regarding those accounts was being received by her and so didn't make inquiry with the bank. All right, thank you. I think we've got your point well in mind. The case just argued, Hornberger v. Merrill Lynch is submitted. Thank both counsel for your argument this morning.
judges: Trott, McKeown, Watford